## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| REPEAT CONSULTANTS INTERNATIONAL, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 24-619 ) |
| THE UNITED STATES, | ) Filed: August 15, 2024 ) |
| Defendant. | ) Re-issued: August 28, 2024* ) |

## OPINION AND ORDER

In this post-award bid protest, Plaintiff Repeat Consultants International, LLC ("RCI") contends that the Defense Logistics Agency ("DLA") improperly awarded contracts for fuel delivery services in Syria and Iraq to Shanica Company ("Shanica") and Hawax Corporation ("Hawax"), respectively. RCI, the incumbent contractor, alleges that DLA should have determined the awardees' proposals were unacceptable because they contained alleged material misrepresentations, and further argues that DLA erred in its price realism analysis and erroneously found both awardees to be responsible. Before the Court are the parties' dispositive motions. As explained below, the Court **DENIES** RCI's Motion for Judgment on the Administrative Record and **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record.

---

* The Court issued this opinion under seal on August 15, 2024, and directed the parties to file any proposed redactions by August 22, 2024. The opinion issued today incorporates the redactions jointly proposed by the parties. Upon review, the Court finds that the material identified warrants protection from public disclosure, as provided in the applicable Protective Order (ECF No. 9). Redacted material is represented by bracketed ellipses "[. . .]."

## I.  BACKGROUND

### A.     The Solicitation and Evaluation Criteria

On April 27, 2023, DLA issued Request for Proposals No. SPE605-23-R-0209 ("RFP" or "Solicitation") seeking proposals for the delivery of fuel in Syria and Erbil, Iraq.  Admin. R. ("AR") at 1–2, ECF No. 22.  Conducted under Federal Acquisition Regulation ("FAR") part 12 procedures, the Solicitation contemplated the award of 17 contract line items ("CLINs"), each with a specific fuel type, quantity, and location.  AR 2, 6–13.  CLINs 1–13 (the "Syria CLINs") covered fuel delivery in Syria and were to be proposed and awarded on an all or none basis, meaning that offerors had to offer on every CLIN and meet all requirements of those CLINs to be considered. AR 2, 6–11.  CLINs 14–17 ("the "Iraq CLINs") covered fuel delivery in Erbil, Iraq and were to be competed for and awarded by individual CLIN.  AR 2, 12–13.

The Solicitation advised that DLA would make an award according to the Lowest Price Technically Acceptable Source Selection Process.  AR 148.  Section M of the Solicitation described a two-part evaluation.  AR 148–49.  First, offerors' proposals would be evaluated for conformance with three "Gateway Steps."  *Id.*  Step One required offerors to be fully registered in the Joint Contingency Contracting System ("JCCS").  AR 148.  Step Two required that offerors demonstrate and provide evidence of their ability to gain access into Erbil Air Base.  *Id.*  Step Three required offerors to demonstrate and provide evidence of their ability to gain access into Syria.  *Id.*  An offeror's failure to meet these preliminary Gateway Steps would result in its elimination from further consideration.  *Id.*  Proposals meeting Steps One through Three were then subject to further review under three evaluation factors: (1) Technical Capability; (2) Past Performance; and (3) Price.  *Id.*

1.      Factor 1 Technical Capability

Factor 1 Technical Capability included three subfactors: Supply, Transportation, and Storage/Distribution.  AR 149.  The Solicitation advised that for this factor and its subfactors DLA would assign an adjectival rating of either acceptable or unacceptable.  *Id.*  Assignment of an unacceptable rating for any of the subfactors would result in an offeror's elimination from the competition. *Id.*

Under Subfactor 1 Supply, the Agency would evaluate the offeror's ability to supply all the products listed in the Solicitation's estimated quantities.  *Id.*  The Solicitation required offerors to submit "[a] detailed description and a map or chart of the offeror's supply chain, from vendor source to final [d]elivery;" a "complete Fuel Source Data Sheet Attachment 3;" "[a]ll Source letters of commitment;" and "Certificates of Quality and/or Analysis . . . for all products listed in the attached schedule[.]" *Id.*

Under Subfactor 2 Transportation, DLA would evaluate the offeror's ability to "arrange and execute transportation to support orders placed under [the] contract and its schedule." *Id.*  The Solicitation required offerors to submit "[a] detailed description of the offeror's plan and movement of product(s) to the locations listed in the [S]olicitation schedule;" "[a] list and description of all leased and owned transportation modes to be used and/or available for use under this contract;" and "[a]ll transportation asset letters of commitment[.]" *Id.*

Under Subfactor 3 Storage, DLA would evaluate the offeror's "ability to provide sufficient intermediate storage throughout the life of the contract to support daily deliveries."  AR 150.  The Solicitation required offerors to submit "[a] list and description of all storage tanks, capacity of storage tanks/facilities and equipment to be used for storage and distribution of the product(s) listed in this contract;" and "[a]ll storage/distribution facilities lessor letters of commitment or

lease agreements." *Id.*

2.    Factor 2 Past Performance

With respect to the Past Performance factor, DLA would evaluate the offeror's past performance references from three current or previously performed contracts. *Id.* The Agency would assess these references for relevance and quality based on how well the contractor performed on projects of similar dollar value, scope, and complexity. *Id.* DLA would score offerors on an acceptable or unacceptable basis. *Id.*

3.    Factor 3 Price

Under Factor 3 Price, the Solicitation instructed offerors to propose a price per gallon for each CLIN using the RFP's Attachment 1, Price Data Sheet. AR 145–46, 151. An offeror's "total offer price" for a particular CLIN reflected the sum of a Government-provided "reference price" per gallon, plus the offeror's differential expenses. AR 151. For evaluation, DLA would determine an offeror's total estimated price by multiplying its offered unit price per gallon for each individual CLIN by the estimated quantity stated in Solicitation Schedule B.105. *Id.* DLA would then perform a price realism analysis to "determine if a low price reflects the contractor's ability to understand the inherent risk in the requirement." *Id.*; *see also* AR 164 ("Price realism will be performed by understanding the market place and the requirement. Prices proposed should be competitive. If proposed prices appear extremely low, then the offeror either doesn't understand the requirement/environment or is low-balling the price.").

Of particular importance to this protest, the Solicitation cautioned offerors of legal prohibitions against the delivery of fuel sourced from Iran, and that blending any portion of the delivered fuel with fuel products sourced from Iran was strictly prohibited. AR 2 ("Any violation of the Iran Sanctions Act is strictly forbidden. Contractor shall not source or blend any portion of

the fuel destined for DLA Energy with refined fuel products sourced from Iran."), 14 (repeating prohibition), 134 (prohibition on contracting with entities engaging in activities or transactions relating to Iran). The Solicitation also advised that "by submission of its offer, the offeror certifies that the offeror, or any person owned or controlled by the offeror, does not engage in any activities for which sanctions may be imposed under section 5 of the Iran Sanctions Act." AR 14.

### B.   Evaluation and Initial Award

DLA received 19 timely proposals. *See* AR 867–68. RCI and Shanica submitted bids for all CLINs, while Hawax only bid on the Iraq CLINs. AR 883. DLA eliminated 13 of the 19 offerors for failure to pass Gateway Steps One and Two. AR 874–81. RCI, Shanica, and Hawax, along with three other offerors, passed the Gateway Steps and continued to the substantive evaluation. AR 881–82.

At the evaluation stage, DLA eliminated three offerors due to unacceptable ratings under Factor 1 Technical Capability, including one offeror that failed to provide the required "supply chain letter or commitment from source." AR 884–87. As relevant here, under Technical Capability, Subfactor 1 Supply, DLA determined that RCI, Shanica, and Hawax each "provided acceptable supply chain from vendor source to final delivery and letters of commitment" and deemed all certificates of analysis and certificates of quality technically acceptable for each required fuel type. *See* AR 884–85. Of note, RCI, Shanica, and Hawax each submitted letters of commitment from the [. . .] Refinery and [. . .] Refinery to meet this requirement. AR 198–201, 524–25, 825–26. DLA ultimately found that RCI, Shanica, and Hawax were acceptable on all technical subfactors and demonstrated acceptable past performance. AR 881–84, 887–88.

For Factor 3 Price, the Agency analyzed the price proposals of RCI and Shanica—as the only remaining eligible offerors—for the Syria CLINs. AR 889–90. Similarly, the Agency

analyzed the price proposals of RCI, Shanica, and Hawax—as the only remaining eligible offerors—for each of the Iraq CLINs.  AR 890–91.  The Agency determined that Shanica proposed the lowest price for the Syria CLINs, RCI proposed the lowest price for Iraq CLIN 14, and Hawax proposed the lowest price for Iraq CLINs 15–17.  AR 889–92, 894.  DLA's price analysis also determined that the prices offered by RCI, Shanica, and Hawax were fair and reasonable.  AR 892–93.

On October 25, 2023, the Source Selection Authority signed the Source Selection Decision Document and directed contract awards be made to Shanica for the Syria CLINs, RCI for Iraq CLIN 14, and Hawax for Iraq CLINs 15–17.  AR 894.

## C.   Procedural Background

### 1.   The First GAO Protest

On November 6, 2023, RCI filed a protest with the Government Accountability Office ("GAO") challenging DLA's evaluation and award decision.  AR 1061–85.  RCI made multiple allegations, including that (1) the procurement was tainted by violations of the Procurement Integrity Act, (2) Hawax was ineligible for award because, among other things, it was not registered in the System for Award Management ("SAM"), (3) Shanica's and Hawax's proposals included material misrepresentations regarding their technical capability, (4) DLA's price realism analysis was unreasonable, and (5) DLA erred in finding that Shanica and Hawax were responsible.  *See id.*  On November 27, 2023, DLA informed the GAO that it intended to take corrective action to investigate RCI's Procurement Integrity Act allegations, re-evaluate price, and review RCI's remaining protest grounds.  AR 1284–85.  The GAO dismissed RCI's protest as moot on December 1, 2023.  AR 1286.

2.      The Agency's Corrective Action Investigation

During corrective action, DLA investigated RCI's allegations and reassessed Shanica's and Hawax's proposals regarding technical acceptability and responsibility, and it reevaluated all price proposals for price realism.  AR 1292–1332.  The Source Selection Authority ultimately reaffirmed his original decision to award the Syria CLINs to Shanica, Iraq CLIN 14 to RCI, and Iraq CLINs 15–17 to Hawax.  AR 1332–33.

A central part of DLA's investigation concerned RCI's allegations of Shanica's and Hawax's violations of the Procurement Integrity Act.  AR 1297–1304.  At the time, RCI had submitted three letters to DLA raising a series of different allegations.[1]  On June 1, 2023, RCI submitted a letter to DLA claiming that a RCI representative had been warned by Erbil Airport Asayish "not to register to conduct business in Syria and . . . not to send any paperwork into Syria for that purpose."[2]  AR 168–69.  RCI also notified DLA that the same RCI representative heard from one of his business contacts that Shanica offered things of value to Syrian officials to receive its authorization to do business in Syria and other favorable treatment with border crossings.  AR 169.

On June 22, 2023, RCI submitted a second letter to DLA contending that Shanica and two other companies (Darya and Property) "are all owned or operated by the family members—as in they are presumed to be affiliated pursuant to Federal Acquisition Regulation [Section 9.403]," and that none of the three companies possess their own fuel farms or tanker trucks.  AR 863–64.  The letter further claimed that Property sources fuel from a blacklisted contractor that reportedly

---

[1] RCI represents that it has ongoing contractual obligations under the incumbent contract to disclose any evidence of potential fraud or wrongdoing.  ECF No. 24 at 17.

[2] Asayish is the Kurdish security organization and the primary intelligence agency operating in the Kurdistan Region in Iraq.  *See id.*

supplies Iranian jet fuel and mixed local diesel fuel, and that Property is under investigation by the Syrian Economic Council due to irregularities in deliveries to the U.K. Ministry of Defense.  AR 864.

On October 31, 2023, RCI submitted a third letter to DLA, alleging that an acquaintance of RCI based in Erbil, Iraq, informed RCI "that members of the Erbil Airbase's Regional Contracting Office . . . had improperly disclosed offerors' proposal pricing to Shanica." AR 1052–56.  This letter further alleged that Hawax's General Manager implied in a conversation with an RCI truck driver that Hawax and Shanica are affiliated, telling him that "Hawax is Shanica and Shanica is Hawax." AR 1055.

To investigate RCI's allegations, the Contracting Officer issued questions to contracting personnel on the source selection team and personnel from the DLA Energy Middle East office regarding any potential leak of procurement information, reviewed the proposals submitted by Shanica and Hawax, and contacted Shanica and Hawax by letter to ask a series of questions on the issues raised by RCI's allegations.  AR 1298–99, 1306–07, 1318–20.  Based on this investigation, the Contracting Officer concluded that "RCI has not provided sufficient information to show that either Shanica or Hawax committed a [Procurement Integrity Act] violation." AR 1323.  He also found that the Erbil Airbase Regional Contracting Office, which was accused of disclosing RCI's price data, "had no involvement" with DLA's Solicitation and had never been in possession of RCI's pricing information.  AR 1321–22 (finding "no evidence that such information was shared" with the Erbil Airbase Regional Contracting Office).

In the context of addressing responsibility, the Contracting Officer found that RCI's allegations regarding affiliation and fuel sourcing were unsubstantiated.  AR 1298–1304, 1306–13.  Specifically, he stated that RCI's allegations were insufficient to conclude that Hawax and

Shanica are affiliated or that Hawax had engaged in improper behavior or intended to source its fuel from Iran. AR 1311–12. Regarding the latter, the Contracting Officer explained that RCI's allegations conflicted with Hawax's "well-documented plans for fuel supply" and its confirmation that it would not supply fuel from Iran. AR 1311. The Contracting Officer also determined, based on Shanica's and Hawax's responses to DLA's requests for confirmation, that there was insufficient evidence to support RCI's claim of affiliation, and that there was a reasonable explanation for certain similarities found in Shanica's and Hawax's proposals. AR 1312. Specifically, Hawax explained that (1) "[d]ue to the nature of the contract and the products to be supplied, sources that can be used are limited and other offerors might have used similar source[s] to ours," and (2) Hawax "used to work with a subcontractor and had previously developed some documentation and information with its ex-subcontractor." *Id.* The Contracting Officer found this was "a reasonable explanation for similarities among the proposals," and further explained that, in any event, "[s]uch similarity does not establish that something improper or illegal occurred." *Id.*

3.    The Second GAO Protest

On January 23, 2024, RCI filed a second protest at the GAO. AR 1349–76. RCI raised more or less the same five challenges as its first protest. AR 1356–73. After DLA filed its agency report, RCI filed comments in response and withdrew its grounds related to the alleged Procurement Integrity Act violations and SAM registration. AR 1676 n.2. As an exhibit to its comments, RCI attached a letter from RCI's counsel to DLA dated February 16, 2024, describing further "fraud and wrongdoing by Hawax Corporation[.]" AR 1691–93. RCI's allegations included that a source witnessed Hawax procuring fuel from trucks that appeared to be licensed in Iran and driven by Iranian nationals, and that this fuel was procured without the proper documentation memorializing the fuel source and transit route. *Id.* The letter also reported a threat

that an RCI employee and RCI itself received via text message following its disclosures to DLA.
*See* AR 1692 (". . . your company don't have right to talk to American about our company and
what type of fuel we work with . . . we received American fuel contract and it's ours . . . I will
make you disappear from Erbil be cautious."). RCI also argued in its comments that while Shanica
and Hawax claimed to have independently drafted their proposals, the proposals contained nearly
10 pages of verbatim text and graphics. AR 1679.

        4.    <u>The Present Protest</u>

On April 19, 2024, 13 days before the deadline for the GAO's decision, RCI filed its
Complaint in this Court. *See* Pl.'s Compl., ECF No. 1. The GAO dismissed RCI's protest on
April 23, 2024, because of the action pending before this Court. AR 5566. On April 26, 2024, the
Court issued an order requesting that the GAO provide an advisory decision on RCI's protest.
Order, ECF No. 11. The GAO filed its advisory decision on May 9, 2024. Advisory Op., ECF
No. 20; *see also* AR 5565–74.

As explained in its decision, the GAO would have denied RCI's protest on all protest
grounds. AR 5565–74. First, the GAO would have denied RCI's arguments that Shanica and
Hawax misrepresented the source of their fuel and their ability to perform the contracts, which the
GAO construed as a claim that the "agency misevaluated awardees' proposals." AR 5565; *see* AR
5568–69. Specifically, the GAO concluded that the Agency's "evaluation was reasonable and
consistent with the solicitation criteria." AR 5565. The GAO also would have denied RCI's
protest of DLA's price realism analysis, since DLA "compared prices of acceptable offerors,
determined that price differences were relatively small, and reasonably concluded the awardee's
low prices were realistic." *Id*. Finally, the GAO would have denied RCI's challenge to DLA's
"affirmative determination of responsibility," because DLA "considered allegations of improper

and illegal acts," "obtained responses from the awardees, and reasonably determined that the responses were credible, consistent, and supported the responsibility determination." *Id.*

On May 24, 2024, RCI filed a Motion for Judgment on the Administrative Record. *See* Pl.'s Mot. for J. on Admin. R., ECF No. 24. The Government filed a Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record on June 7, 2024. *See* Def.'s Mot. to Dismiss and Cross-Mot. for J. on Admin. R., ECF No. 27. The parties completed briefing on these dispositive motions on June 27, 2024. *See* Pl.'s Reply, ECF No. 30; Def.'s Reply, ECF No. 33.[3] The Court held oral argument on the parties' cross-motions on July 11, 2024.

## II.  LEGAL STANDARDS

### A.    Motions for Judgment on the Administrative Record

Rule 52.1(c) governs motions for judgment on the administrative record. Such motions are "properly understood as . . . an expedited trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the [challenged action or] decision was not in accordance with the law." *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357). Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record. *See Bannum*, 404 F.3d at 1357.

---

[3] In its Motion to Dismiss, the Government argued that RCI lost access to Syria, meaning it would be ineligible for any contract award to deliver fuel in the region; therefore, RCI's protest of the award to Shanica for the Syria CLINs was moot. ECF No. 27 at 27–29; *see* AR 145, 148 (discussing Gateway Step 3). In its Reply, however, the Government represented that "the facts on the ground are changing regarding RCI's ability to access Syria." ECF No. 33 at 27. Recognizing that RCI retains an apparent concrete interest in this protest, the Government withdrew its Motion to Dismiss. *Id.*

**B.** **Bid Protest Standard of Review**

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, provides the Court of Federal Claims with "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1). In such actions, the Court "review[s] the agency's decision pursuant to the standards set forth in section 706" of the Administrative Procedure Act ("APA"). *Id.* § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Accordingly, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001). To prevail in a bid protest, "a protestor must show a significant, prejudicial error in the procurement process." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). A protestor establishes prejudice by showing "that there was a substantial chance it would have received the contract award but for that error." *Alfa Laval*, 175 F.3d at 1367 (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). An "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.

In reviewing an agency's procurement decisions, the Court may not substitute its judgment for that of the agency. *See Redland Genstar, Inc. v. United States*, 39 Fed. Cl. 220, 231 (1997); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997); *see also M.W. Kellogg Co. v.*

*United States*, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations"). The disappointed bidder "bears a heavy burden," and the contracting officer is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa*, 238 F.3d at 1332–33 (citations and quotes omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." *Bromley Contracting Co. v. United States*, 15 Cl. Ct. 100, 105 (1988); *see Campbell v. United States*, 2 Cl. Ct. 247, 249 (1983). A procurement decision is rational if "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1333. "[T]hat explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (citing *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).

## III. DISCUSSION

RCI challenges DLA's awards to Shanica and Hawax on five grounds. It alleges that (1) Shanica's and Hawax's proposals contained material misrepresentations; (2) Shanica's and Hawax's proposals were technically deficient; (3) the Agency's corrective action investigation was irrational; (4) the Agency's price realism analysis was irrational; and (5) the Agency's responsibility determinations for Shanica and Hawax were irrational and contrary to regulation. The Court concludes that RCI's protest is unavailing on all grounds.[4]

### A.   Shanica's and Hawax's Proposals Did Not Contain Material Misrepresentations.

RCI's principal challenge is that Shanica and Hawax materially misrepresented their ability

---

[4] The parties do not dispute that RCI has standing to bring this protest. And since the Tucker Act's "interested party" requirement presents a question of statutory standing that does not implicate this Court's subject-matter jurisdiction, the Court need not make its own preliminary determination of standing before addressing the merits. *See CACI, Inc.-Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023).

to supply fuel to DLA under the terms of the Solicitation.  ECF No. 24 at 23–27.  This allegation is based on a reference to an "exclusive supply agreement" in letters of commitment from two Iraqi oil refineries, [. . .] and [. . .], submitted with Shanica's and Hawax's proposals.  *Id.* at 24.  Based on the use of the term "exclusive," RCI contends that the statements made in the letters are false—which, according to RCI, amounts to a material misrepresentation in Shanica's and Hawax's proposals.  *Id.* at 24–27.

To establish a material misrepresentation, "plaintiffs must demonstrate that (1) the awardee made a false statement; and (2) the agency relied upon that false statement in selecting the awardee's proposal for the contract award."  *Connected Glob. Sols., LLC v. United States*, 159 Fed. Cl. 801, 805 (2022) (internal quotations omitted) (quoting *Blue & Gold Fleet, LP v. United States*, 70 Fed. Cl. 487, 495 (2006)); *see also Sealift, Inc. v. United States*, 82 Fed. Cl. 527, 538 (2008).

Here, the Solicitation required all offerors to provide, as part of their technical proposals, a "detailed description and a map or chart of the offerors' supply chain, from vendor source to final Delivery" and "[a]ll Source letters of commitments."  AR 149.  The Solicitation stated that the source letters of commitment should include, in relevant part, "[r]eference to specific and current Solicitation number," "[r]eference to Product being offered for supply," and a signature from the "owner/president/CEO of the company providing the service."  AR 155.  In response to this requirement, Shanica submitted letters of commitment from the [. . .], [. . .] Refinery, [. . .] Refinery, [. . .], and [. . .].  AR 523–27.  Hawax submitted letters of commitment from [. . .] Refinery, [. . .] Refinery, and [. . .], and further explained that it would request fuel from the [. . .].  AR 825–27.  Each of the letters from [. . .] and [. . .] represented that the refinery "enter[ed] into an exclusive supply agreement" with the offeror for purposes of fulfilling the Solicitation's fuel

requirements.[5]  AR 825; *see* AR 524–25, 826.

DLA rated Shanica and Hawax as "acceptable" for the supply subfactor of the technical evaluation.  *See* AR 884.  With respect to Shanica, the Source Selection Authority found that "[a]s required in the [S]olicitation, [Shanica] provided acceptable supply chain from vendor source to final delivery."  AR 885; *see also* AR 520 (map of Shanica's sources of fuel and storage facilities). It also found that Shanica provided all requisite letters of commitment and that Shanica's certificates of analysis/certificates of quality "were deemed technically acceptable by the technical evaluators for each fuel type required in the solicitation."  AR 885; *see also* AR 529–41.  The same was true for Hawax.  AR 884 (finding that Hawax "provided acceptable supply chain . . . from vendor source to final delivery," that Hawax also provided the required "letters of commitment," and that Hawax's certificates of analysis/certificates of quality "were deemed technically acceptable by the technical evaluators for each fuel type required in the solicitation"); *see also* AR 828–35.

RCI maintains that the letters of commitment from the [. . .] and [. . .] refineries are necessarily false because "it is impossible for two offerors to have exclusive supply relationships with the same refineries covering the same fuel under the same CLINs of the same Solicitation." ECF No. 30 at 8.  RCI initially argued that the letters' use of the word "exclusive" promised an

---

[5] The two letters from the [. . .] Refinery contain almost identical language for both Shanica and Hawax.  *Compare* AR 525 ("[. . .] Refinery is pleased to enter into an exclusive supply agreement with Shanica Company, in their efforts to fulfill DLA supply requirements under Solicitation # SPE605-23-R-0209 in Iraq & Syria required line items 0001 to 0017 during Full contract period plus any additional required option period." (emphasis omitted)) *with* AR 825 (same but substituting Hawax's name).  The same is true regarding the two letters from the [. . .] Refinery.  *Compare* AR 524 ("[. . .] is pleased to enter into an exclusive supply agreement with Shanica Company, in their efforts to fulfill DLA supply requirements under Solicitation #SPE605-23-R-0209 in Iraq & Syria required line items 0001 to 0017 during Full contract period plus any additional required option period." (emphasis omitted)) *with* AR 826 (same but substituting Hawax's name).

"exclusive license"—*i.e.*, a promise that "'gives the licensee the **sole right** to perform the licensed act, often in a defined territory, and that prohibits the licensor from performing the licensed act and from granting the right to anyone else.'"  ECF No. 24 at 25 (emphasis in original) (quoting *License*, BLACK'S LAW DICTIONARY (11th ed. 2019)).  But, as the Government correctly pointed out, use of the term "license" does not appear in any of the disputed supply letters and, more importantly, a fuel supply agreement does not qualify as a license under the provided definitions. ECF No. 27 at 35–36.

In subsequent briefing, RCI recalibrated its argument, contending that use of the word "exclusive" in Shanica's and Hawax's letters of commitment from the [. . .] and [. . .] refineries promised to supply fuel to a single purchaser.  *See* ECF No. 30 at 8–9.  To support this argument, RCI relies on a definition of "exclusive" denoting something that is "[l]imited to a particular person, group, entity, or thing;" "[u]nable to be true if something else is true;" and "[w]hole; undivided."  *Id.* at 8 (quoting *Exclusive*, BLACK'S LAW DICTIONARY (11th ed. 2019)).  As applied here, RCI argues that "'exclusive' means one company gets the fuel, and others do not."  ECF No. 30 at 11–12.  But, as the Government correctly notes, the definition of "exclusive" cited by RCI does not support such a narrow meaning, as the term "exclusive" includes arrangements "[l]imited to a particular . . . *group*[.]"  ECF No. 33 at 8 (emphasis in original) (quoting *Exclusive*, BLACK'S LAW DICTIONARY (11th ed. 2019)).  This reading forecloses RCI's claim that it would be "impossible" for the letters of commitment to be extended to a group of offerors including both Shanica and Hawax.  *Id.*

Considering the text of the letters and the record as a whole, RCI has not met its burden to show a material misrepresentation.  The refineries' use of the phrase "exclusive supply agreement" in the letters of commitment does not reasonably reflect an intention to offer fuel to only one

potential fuel purchaser.  Even assuming it is appropriate to expect an Iraqi oil refinery to use an English term consistent with the terminology of United States law, as discussed above, the Black's Law definition of "exclusive" is not as limited as RCI contends.

Moreover, it does not appear that either the refineries or the offerors understood the commitment represented in the letters to be so restrictive.  Two other offerors—[. . .] and [. . .]—submitted letters of commitment from the [. . .] Refinery that also referenced an "exclusive supply agreement."[6]  AR 4791, 5278.  Each of these letters was signed by a representative of the refinery and made the necessary commitment to provide certain types of fuel as required under the terms of the Solicitation.  AR 524–25, 825–26, 4791, 5278.  Further, RCI's own proposal included letters of commitment related to the [. . .] and [. . .] refineries, which do not mention the term "exclusive." AR 200–01.  If RCI were correct in its interpretation of Shanica's and Hawax's letters of commitment, one would not expect the [. . .] and [. . .] refineries to provide letters to other offerors (sometimes using the term "exclusive," sometimes not) for purposes of the same Solicitation. Although RCI would say this proves the falsehood in the letters, it more likely than not supports the contrary conclusion—*i.e.*, that "exclusive" does not carry the significance that RCI wishes to assign it.  This is underscored by the fact that Shanica and Hawax, as offerors, did not treat their relationship with the [. . .] and [. . .] refineries as "exclusive" either, and instead provided letters of commitment from other refineries to supply the same fuel types covered by the letters at issue.[7] *See* AR 523, 526–27, 825, 827.  Accordingly, the Court rejects RCI's argument that Shanica's and

---

[6] The letters from the [. . .] Refinery submitted by [. . .] and [. . .] are almost identical to the [. . .] letters submitted by Shanica and Hawax.  *Compare* AR 525, 825 *with* AR 4791, 5278.  RCI does not implicate these offerors in its allegations.

[7] Interestingly, a third refinery, [. . .], included similar "exclusive" language in its letter of commitment to Shanica.  AR 527.

Hawax's proposals contained misrepresentations.[8]

Though the inquiry could stop here, even accepting that the letters from [. . .] and [. . .] falsely promised to supply fuel to only one company, RCI has not shown that a material requirement of the Solicitation—the offerors' ability to deliver all fuel types in the necessary quantities—has been impacted. RCI argues that "[t]he absence of an exclusive supply commitment amounts to no supply commitment." ECF No. 30 at 11. But this conclusion does not follow from its premise. If what makes the representation of an "exclusive" agreement false, is that the refineries made the same representation in letters to other offerors, then, in truth, [. . .] and [. . .] promised to supply fuel to multiple companies (not just one) to meet the Solicitation's requirements. That promise was clearly set forth in the letters of commitment, regardless of the use of the term exclusive. *See* AR 524–25, 825–26. RCI has thus not shown that the purportedly false promise of exclusivity means that the [. . .] and [. . .] refineries did not commit *at all* to supply the required fuel.

Additionally, the record does not show that DLA relied on the purported exclusivity of any supply agreement in evaluating technical proposals. *See Connected Glob. Sols.*, 159 Fed. Cl. at 805–06. The Source Selection Authority simply found that Shanica and Hawax provided an acceptable supply chain, without mentioning any particular supplier or the exclusivity of any

---

[8] Although RCI asserts that the misrepresentation is clear on the face of the record, if the Court is unable to determine whether the letters contain material misrepresentations, RCI requests in the alternative that the Court grant limited discovery or a remand back to the Agency to resolve the alleged misrepresentation. ECF No. 24 at 27–29. The United States Court of Appeals for the Federal Circuit has consistently held that, under the APA standard applied in bid protest cases, the focal point of judicial review should be the administrative record already in existence, not a new record made initially in the reviewing court. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). Supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review. *Id.* Here, the Court finds that the existing administrative record is sufficient to resolve—and reject—RCI's claim of material misrepresentation, and therefore **DENIES** RCI's request for limited discovery or remand.

supply agreement.  *See* AR 884–85.  Regardless, both Shanica and Hawax had other letters of commitment for each of the required types of fuel.  Setting aside the letters of commitment from the [. . .] and [. . .] refineries, Shanica provided letters of commitment from three other suppliers, collectively covering the Solicitation's requirements.  *See* AR 523, 526–527.  Similarly, Hawax provided one other letter of commitment for all required fuel types.  *See* AR 827.  Thus, even if the Agency should not have considered Shanica's and Hawax's letters from [. . .] and [. . .], both offerors were still able to meet the Solicitation's supply requirements.

In sum, since RCI has not met its burden to prove misrepresentation or materiality, this ground of its protest is without merit.

**B.      Shanica's and Hawax's Proposals Were Not Technically Deficient.**

RCI independently challenges DLA's technical evaluation, arguing that because Shanica's and Hawax's proposals contained false statements, the Contracting Officer could not rationally determine that their respective proposals were technically acceptable. ECF No. 24 at 29–31. According to RCI, "a proposal that falsely represents an exclusive supplier relationship with a refinery is also technically unacceptable under the Solicitation for failure to provide evidence of a valid supplier arrangement with the refinery the offeror proposed to use." *Id.* at 30.  RCI acknowledges that this protest ground turns on the same facts underlying its misrepresentation claim.  ECF No. 30 at 11.

As previously described, the Solicitation required that each offeror provide DLA with "all [s]ource letters of commitment[]" substantiating the offeror's relationship with each fuel supplier to be used during performance.  AR 145.  There was no requirement for how many letters should be obtained, any particular refineries from which offerors should source fuel, or whether supply commitments should be exclusive.  The Solicitation required only that each offeror's source letters

of commitment should include a "[r]eference to specific and current Solicitation number," "[r]eference to Product being offered for supply," and a signature from the "owner/president/CEO of the company providing the service." AR 155. The letters served as a precondition to each offeror's technical acceptability, which DLA was required to evaluate. *See id.* Shanica and Hawax each proposed to supply fuel from, among other refineries, the [. . .] Refinery and the [. . .] Refinery, and, as required by the Solicitation, each submitted letters of commitment from those refineries. AR 521, 524–25, 823, 825–26. The letters submitted by Shanica and Hawax was signed by a representative of the refinery and made the necessary commitment to provide certain types of fuel as required for the fuel delivery contract under the terms of the Solicitation. AR 524–25, 825–26.

Absent a finding of material misrepresentation, which the Court has rejected, there is no evidence to suggest it was irrational for the Contracting Officer to determine that Shanica and Hawax had commitments from the [. . .] and [. . .] refineries, and that Shanica's and Hawax's proposals were technically acceptable under the supply subfactor. RCI primarily faults DLA for relying on the almost-identical letters of commitment from [. . .] Refinery and [. . .] Refinery purporting to provide "exclusive supply" to both Shanica and Hawax to satisfy the Solicitation's fuel supply requirement and failing to document a rationale that reconciles the purported inconsistencies in the record. ECF No. 24 at 30; ECF No. 30 at 11. The APA, however, does not require a written explanation for agency action in every circumstance, *see Impresa*, 238 F.3d at 1337, and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp. Inc. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 286 (1974). Here, the Court has already found RCI's interpretation of the relevant letters of commitment to be unsupported by the plain meaning of the text and the record as a whole. The

Court thus sees no reason to question the Agency's conclusion that these letters satisfied the Solicitation's commitment requirements, nor any need to remand the matter to DLA to provide a written rationale.  *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) ("When an officer's decision is reasonable, neither a court nor the GAO may substitute its judgment for that of the agency.").

Given that Shanica's and Hawax's technical proposals complied with the Solicitation, and given the significant discretion afforded to procurement agencies, the Court finds that DLA's technical evaluation was neither arbitrary nor capricious.

**C.    The Government Reasonably Conducted its Investigation of Shanica and Hawax.**

RCI next challenges the adequacy of DLA's investigation of Shanica and Hawax during corrective action.  RCI contends that DLA failed to meaningfully consider RCI's reports of misconduct by Shanica and Hawax and the similarity of the offerors' proposals, instead performing a "perfunctory investigation" that in part relied on denials by the very companies under scrutiny. ECF No. 24 at 41–49.  Although the Court agrees that the allegations are concerning, as detailed below, DLA adequately investigated RCI's allegations and rationally found that Shanica and Hawax were responsible.

The Court reviews claims of inadequate investigation under the APA's arbitrary and capricious standard.  *Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 115 (2021) (citing *PAI Corp. v. United States*, 614 F.3d 1347, 1352–53 (Fed. Cir. 2010)), *subsequent determination*, 156 Fed. Cl. 594, *appeal filed* Fed. Cir. No. 22-1557.  An agency's decision comports with the APA if the agency provided a "'rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  As the United States Court of Appeals for the Federal Circuit has recognized,

"[w]here an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a bid." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1330 (Fed. Cir. 2011). "[T]he offeror's potential failure to comply with the proposal requirements is ordinarily 'a matter of contract administration,' which does not go to the propriety of accepting the bid." *Id.* (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009)).

*First*, RCI contends that the Agency arbitrarily discounted RCI's reports of irregularities and improprieties involving Shanica and Hawax, including that Shanica and Hawax are closely affiliated, source prohibited Iranian fuel and circumvent requirements to memorialize fuel source and transit routes, and lack the transportation assets needed to perform. ECF No. 24 at 42–44 (citing AR 168–70, 863–64, 1052–60, 1691–93). But the record shows that DLA did investigate each of these allegations. AR 1298–1304, 1307–13. With regard to alleged affiliation, the Contracting Officer submitted questions to Shanica and Hawax based on RCI's allegations and found the allegations to be unsubstantiated. AR 1303 ("The Contracting Officer also considered [RCI]'s assertions and submissions concerning its claim that Shanica and Hawax are either affiliates or the same company. The Contracting Officer finds that the information submitted by [RCI] is insufficient to draw that conclusion."); *see also* AR 1312, 1304 n.2, 1313 n.3. Likewise, the Contracting Officer "reviewed, considered, and investigated" RCI's allegations that Shanica and Hawax misrepresented their supply plans with regard to fuel sources, transit routes, and possession of transportation assets. AR 1302–03, 1311–12. The Contracting Officer found that each offeror's proposal listed adequate trucks and drivers, "provided detailed routes it intended to use," and had "well documented plans for fuel supply." *Id.* Simply because RCI disagrees with the outcome of DLA's investigation does not mean that the investigation failed to consider its

allegations or lacked a rational basis.  That DLA ultimately chose to rely on Shanica's and Hawax's certifications over RCI's allegations is a matter within the Agency's discretion, which the Court will not second guess.  *See Allied Tech. Grp.*, 649 F.3d at 1330.

    *Second*, RCI protests the scope and adequacy of the Agency's investigation.  ECF No. 24 at 44–47.  The Contracting Officer's investigation consisted of three steps: (1) review of government databases to confirm that neither Shanica nor Hawax was under sanction or restriction; (2) re-review of Shanica's and Hawax's proposals; and (3) asking Shanica and Hawax to re-affirm representations made in their proposals.  *Id.* at 44 (citing AR 1298–1304, 1305–13).  While it is true that the Agency took only these steps, it cannot be said that the investigation was insufficient or conducted in such a way that it would not uncover relevant evidence.

    As an initial matter, since RCI withdrew its allegation of a Procurement Integrity Act violation before the GAO (and has not reasserted it here), the Court construes RCI's challenges to the Agency's investigation as a challenge to its responsibility determination, which is the context in which the Contracting Officer considered the allegations.  *See* AR 1297–3013.  "Contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination." *Impresa*, 238 F.3d at 1334–35 (quoting *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)); *see John C. Grimberg*, 185 F.3d at 1303 (holding that the contracting officer is "the arbiter of what, and how much, information he needs" and is not obligated "to seek additional or clarifying responsibility information from a contractor").  "[C]ourts may review such decisions . . . for an abuse of discretion." *John C. Grimberg*, 185 F.3d at 1303.  Pursuant to FAR 9.105-1, a contracting officer must "possess or obtain information" sufficient to satisfy himself or herself that the prospective contractor meets applicable responsibility standards.  48 C.F.R. §

9.105-1(a).   Importantly, each of the methods used by DLA to obtain information about Shanica and Hawax during its investigation is listed under FAR 9.105-1(c) as an appropriate method for obtaining information to make a responsibility determination.  *See id.* § 9.105-1(c) (directing contracting officers to review certain databases, bid or proposal information, and questionnaire replies).

This includes review of government databases.  Here, the Contracting Officer searched SAM, the U.S. Department of Commerce Bureau of Industry and Security's Denied Person List, and the U.S. Department of the Treasury Office of Foreign Asset Control's Specially Designated Nationals and Blocked Persons List to confirm that Shanica and Hawax (as well as its officers) were not under sanction or restriction and that "there was no exclusion or derogatory information at sam.gov."  AR 1298; *see also* AR 1306.  RCI contends that a contracting officer could not reasonably expect to find that Shanica or Hawax were debarred or subject to sanctions based on the allegations raised by RCI, as any such finding would only be reached after DLA completed the investigation into the allegations.  ECF No. 24 at 45.  But debarment or sanctions based on other conduct (especially similar conduct) would nonetheless be relevant to assessing the allegations, and RCI fails to recognize that additional information could have become available in the databases that was not present at the time of contract award.  Thus, this step of the Agency's investigation was wholly rational.

The Contracting Officer also re-reviewed Shanica's and Hawax's proposals, concluding that the proposals met Solicitation requirements and that DLA could reasonably expect that both companies would "successfully perform the required effort."  AR 1298; *see* AR 1306.  RCI contends that re-review of the proposals would not uncover new internal contradictions or produce any admissions of falsity.  ECF No. 24 at 45.  This argument ignores that in order to weigh RCI's

claim about what Shanica and Hawax would do with respect to performance the Contracting Officer also needed to take into account Shanica's and Hawax's plans for performance. It is possible that the Contracting Officer could have changed his mind about the acceptability of the technical proposals, or at least identified concerns with the proposals that would prompt clarification, especially in light of the allegations RCI made in its letter dated October 31, 2023, notifying DLA of suspected Procurement Integrity Act violations. *See* AR 1055 ("Hawax is Shanica and Shanica is Hawax.").

Finally, the Contracting Officer submitted questions to Shanica and Hawax about the representations made in their proposals. *See* AR 1287–88, 1289–91. RCI argues that it was unlikely Shanica and Hawax would admit that any aspect of their respective proposals was false. ECF No. 24 at 46–47. Querying the alleged wrongdoers, like re-reviewing their proposals, seems to the Court a reasonable investigatory step. RCI does not appear to dispute that conclusion, but rather claims that DLA asked the wrong questions.[9] Because of the Agency's obligations pursuant to the Procurement Integrity Act, the Contracting Officer was somewhat hamstrung in what he could disclose to Shanica or Hawax. *See* 41 U.S.C. § 2102(a)(1) (prohibiting federal government officials from "knowingly disclos[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract on which the information relates"). In any event, the Contracting Officer is the "arbiter" of what questions, if any, should be asked. *John C. Grimberg*, 185 F.3d at 1303. The Court sees no abuse of discretion in issuing the confirmation requests, and will not substitute its judgment for that of the Agency on this point.

---

[9] Although RCI's alternative request for discovery was targeted at the misrepresentation claim, the proposed interrogatories it submitted included some interrogatories presumably aimed at eliciting more fulsome responses from Shanica and Hawax relevant to RCI's other allegations. *See* ECF No. 24-1 at 6–7, 8–9; *see, e.g., id.* at 8 ("1. Identify any corporate relationship of any kind you have or had with any other offeror.").

Nor has RCI shown that the conclusions the Contracting Officer drew from Shanica's and Hawax's responses were irrational.  For example, as relevant to the affiliation allegation, the Contracting Officer observed similarities between Shanica's and Hawax's proposals, and asked the offerors whether they were aware of any similarities between their proposals and the proposal of any other offeror and, if so, to explain the similarities.  *See* AR 1288, 1291, 1304, 1312.  Both companies responded that they were unaware of such similarities, *see* AR 1288, 1291, with Hawax further explaining:

> Due to the nature of the contract and the products to be supplied, sources that can be used are limited and other offerors might have used similar source to ours . . . . Hawax Corporation used to work with a subcontractor and had previously developed some documentation and information with its ex-subcontractor. However, for and during the submission we confirm Hawax Corporation used [its] own documents for the proposal.

AR 1291.  The Contracting Officer found this to be a "reasonable explanation for similarities among the proposals," and "[t]o the extent it does not explain every instance of similarity," he concluded "that the similarity among proposals is not a sufficient basis on which to determine Shanica [and Hawax] nonresponsible."  AR 1304; *see* AR 1312.

This conclusion is reasonable based on the evidence in the record.  As RCI correctly points out, Shanica's and Hawax's proposals included about 10 pages of nearly identical text (including the same typos), as well as the same graphics and photographs.  ECF No. 30 at 18; *compare* AR 542–53 *with* AR 836–46.  The duplicative section appeared in their Subfactor 2 Transportation proposals, and essentially set forth procedures each offeror would employ to ensure the quality of the fuel products from vendor source to final delivery.  *See, e.g.*, AR 542.  Having reviewed the procedures, it would be reasonable to conclude, as an explanation for the similarities, that this section was created by a subcontractor given the general, "best practices" nature of procedures.  It would also explain the use of the same graphics and photographs depicting equipment each offeror

26

uses.  *See, e.g., id.* at 550 (depicting photographs of injectors and water separators apparently in use at a facility but not representing that the photographs were taken at either offerors' facility).

Even if this is not the subcontractor-created work to which Hawax's response referred, it is also reasonable to conclude that the similarity "does not establish that something improper or illegal occurred."  AR 1304; *see* AR 1312.  RCI contends that the similarities are evidence that Shanica and Hawax colluded in submitting proposals, coordinating with each other to divide the CLINs and submit pricing that resulted in an award to each offeror.  ECF No. 24 at 9, 47–48.  While the duplication is certainly concerning to the Court, whether it raised a red flag of something more nefarious is a judgment call within the Contracting Officer's discretion to make.  Based on the record before the Court, RCI has failed to show that the Contracting Officer abused that discretion.[10]

*Third*, relying on *Oak Grove*, RCI claims that the Agency should have further investigated or probed the veracity of various representations in Shanica's and Hawax's proposals.  ECF No. 24 at 48 (citing *Oak Grove Techs.*, 155 Fed. Cl. at 114–20).  In *Oak Grove*, the court found that the procuring agency failed to adequately investigate the protestor's allegation that a procurement official improperly influenced the procurement in favor of another company.  *Oak Grove*, 155 Fed. Cl. at 114–16.  The agency reviewed written statements by four individuals involved in the evaluation process and conducted two in-person interviews.  *Id.* at 116.  All four individuals

---

[10] RCI points out another similarity between Shanica's and Hawax's proposals, which "include the exact same scans for the [certificates of quality/certificates of analysis] from [. . .] and [. . .] refineries—complete with the same creases and discoloration on the paper."  ECF No. 24 at 45 (citing AR 529, 530, 828, 830).  The Contracting Officer did not specifically address these documents, but the Court agrees with the Government that a commonplace explanation for this similarity is that the offerors asked the refineries for the relevant documentation and the refineries provided it.  *See* ECF No. 27 at 61–62.  Moreover, the Agency's technical evaluators reviewed all certificates of quality submitted with Shanica's and Hawax's proposals and deemed them technically acceptable.  AR 884, 885.

categorically denied that they knew anything that would lead them to believe the official improperly influenced the award, and the official himself similarly made a "blanket denial." *Id.* The court took issue with the agency's decision not to interview the awardee's two former employees who raised the allegations, noting that the agency's efforts were "the start of a reasonable investigation" but its "failure to do more was insufficient[.]" *Id.*

*Oak Grove* is distinguishable from the instant case. The decision in *Oak Grove* addressed allegations of a conflict of interest prohibited by FAR 3.101-1, and it effectively boiled down to a credibility determination involving two irreconcilable versions of the facts. *Id.* at 115–16. Here, RCI withdrew its claim of a Procurement Integrity Act violation before the GAO and has not alleged before this Court any wrongdoing by the DLA or its officials involved in the evaluation process. RCI's argument also does not raise a credibility question, resolution of which would necessarily require DLA to obtain and weigh contrary statements. RCI, unlike the protestor in *Oak Grove*, simply argues that the Agency could have done more to confirm or refute RCI's allegations.

The Court does not disagree, but that is not the question it must ask when reviewing the Agency's investigation. As a judge of this Court put it:

> Could the [Agency] have designed a more expansive investigation? Certainly. Would this Court have conducted the investigation in the same manner as the [Agency]? Maybe not. Yet, these are not the questions that this Court must answer while weighing Plaintiff's protest. The [Agency]'s responsibility was to reasonably investigate the alleged [] violation and draw a rational conclusion from its findings. *Dell Fed. Sys.*, 906 F.3d at 992. Based on the record before it, the Court is satisfied that the [Agency] fulfilled those obligations . . . .

*Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 810 (2022). This characterization of the standard of review applies with equal force here. DLA's decisions regarding how to design and carry out its investigation of RCI's allegations concerning Shanica and Hawax are matters

committed to DLA's discretion and expertise, which the Court will not disturb.  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  RCI's mere disagreement with DLA's judgment is not sufficient to show that DLA's investigation was arbitrary or capricious.  *See Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

**D.      The Government Conducted a Rational Price Realism Analysis.**

RCI also challenges the Agency's price realism analysis, arguing that DLA irrationally used a price comparison methodology and "government-mandated plug numbers."  ECF No. 24 at 36–39.  The Court holds that the Agency's chosen price realism methodology was an exercise of the Agency's discretion; accordingly, this ground of RCI's protest fails.

A price realism analysis evaluates an offeror's overall price to ensure that it is not so low as to threaten contract performance.  *See, e.g., Asset Prot. & Sec. Servs. v. United States*, 5 F.4th 1361, 1363 (Fed. Cir. 2021); *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 663 (2010).  "[T]he FAR is silent on how to conduct a price realism analysis."  *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 530 (2007).  If the terms of a solicitation dictate how an agency is to conduct such analysis, the Court must "'determine whether the agency's price-realism analysis was consistent with the evaluation criteria set forth in the [solicitation].'"  *Rotech Healthcare, Inc. v. United States*, 121 Fed. Cl. 387, 404 (2015) (quoting *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009)).  However, when a solicitation does not mandate a particular method, the Court reviews the agency's chosen methodology with substantial deference.  *Id.* (leaving a price realism analysis "methodology . . . to the agency's discretion" when "the RFP did not make any commitments to perform a price realism analysis in any particular manner"); *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 358 (2009) ("[T]he nature and extent of a price realism analysis is ultimately within the sound exercise of the agency's

discretion, unless the agency commits itself to a particular methodology in a solicitation.").

Here, the Solicitation provided that the price evaluation "for each CLIN will be made by determining the total estimated price for that CLIN." AR 151. A CLIN's total estimated price was determined by multiplying the offered unit price per gallon for each individual CLIN by the estimated quantity stated in the Solicitation schedule. *Id.* The Solicitation explained that "[t]he resultant price will be the total offer price that the Government will evaluate for purposes of contract award." *Id.* The Solicitation further explained that "[w]hen evaluating Price, the Government will also look at Price Realism to determine if a low price reflects the contractor's ability to understand the inherent risk in the requirement." *Id.* In response to an offeror's question, the Agency also explained that "[p]rice realism will be performed by understanding the market place and the requirement . . . . If the proposed prices appear extremely low, then the offeror either doesn't understand the requirement/environment or is low balling the price." AR 164.

The Agency evaluated all three of the lowest price technically acceptable offerors—*i.e.*, Shanica, RCI, and Hawax—and determined that "all three companies . . . offered realistic prices." AR 1292. With regard to the Syria CLINs, the Contracting Officer "conducted a comparison of Shanica and RCI's prices . . . since these were the only two companies found technically acceptable for these CLINs." AR 1293. The Contracting Officer compared Shanica's total price of $[. . .] with RCI's total price of $[. . .] and calculated a $[. . .] difference between the two proposals. *Id.* The Contacting Officer found that a difference of approximately $[. . .] was not significant "for an approximately three year contract for an estimated 16,226,400 U.S. gallons of fuel" and that Shanica's total evaluated price for the Syria CLINs was realistic. *Id.*

The Contracting Officer evaluated the Iraq CLINs on an individual basis. AR 1294–96. With regard to CLIN 15, the Contracting Officer found "there was adequate price competition . . .

and all technically acceptable offerors (Hawax, Shanica, and RCI) were reasonably close in price."

AR 1295.  The per-gallon price for CLIN 15 ranged from $[. . .] per U.S. gallon to $[. . .] per U.S.

gallon, which equated to total evaluated prices ranging from $[. . .] to $[. . .].  *Id.*  "Based alone on

this range and adequate price competition," the Contracting Officer found that "Hawax's price is

realistic and not too low."  *Id.*  Nonetheless, the Contracting Officer conducted additional analysis

of the differences between the offerors' prices, finding "a modest difference between the lowest

technically acceptable price (Hawax) and the highest (RCI)."  *Id.*  The Contracting Officer went

on to explain that "the second lowest offer price (Shanica) is $[. . .] lower than the highest of the

three (RCI), while the lowest price (Hawax) is only about $[. . .] lower than the second lowest

offeror (Shanica)."  *Id.*  The Contracting Officer then concluded that "a price difference of only

$[. . .] between the lowest and the second lowest offeror shows that Hawax's low offer is realistic."

*Id.*

The    Contracting    Officer    also    "analyzed    Hawax's    $[.  .  .]/U.S.    gallon

'differential/expenses'" for CLIN 15.  *Id.*  This figure "is the difference between the reference

price and the Total Offer Price per U.S. gallon,"[11] and it "generally captures the costs (beyond

fuel), expenses, and profit an offeror wishes to build into its price to calculate the Total Offer Price

per U.S. gallon."  *Id.*  The Contracting Officer explained:

> For CLIN 15, Hawax's $[. . .]/U.S. gallon differential/expenses adds $[. . .]/U.S.
> gallon to its price above and beyond what it reasonably expects to pay for the JP8
> under CLIN 0015.  This is modestly lower than its competition (Shanica ($[. .
> .]/U.S. gallon) and RCI ($[. . .]/U.S. gallon)).  However, there is only an
> approximately $[. . .]/U.S. gallon difference between Hawax and the next lowest
> offeror, Shanica, while the difference between Shanica and the highest technically
> acceptable offeror (RCI) is $[. . .]/U.S. gallon. This reflects a modest range within

---

[11] "The reference price is the market price for fuel, published in an independent publication (Platts) with which the award price fluctuates."  AR 1295.  "[T]he actual price an offeror pays for fuel . . . may be more or less than the reference price; however, it serves as an approximation of an offeror's anticipated fuel cost[.]"  *Id.*

which offerors may adjust their expenses/costs/profit for the ultimate price offer to the Government.  Therefore, Hawax's differential does not make its price so low as to suggest it does not understand the requirement.  More importantly, a differential of approximately $[. . .]/U.S. gallon leaves an adequate margin, above and beyond the estimated cost of fuel (the reference price), to cover the remaining costs, expenses, and profit to supply the required fuel.

*Id.*  Accordingly, the Contracting Officer determined Hawax's price for CLIN 15 was realistic.

The Contracting Officer performed similar individual analyses for CLINs 16 and 17.  AR 1296.  "[I]n each case, based alone on the range between the lowest and highest offer prices and adequate price competition," the Contracting Officer found that "Hawax's price is realistic and not too low."  *Id.*  The Contracting Officer also pointed out that "in each case the difference between the low offer (Hawax) and the second lowest offer (Shanica) was far less than the difference between Shanica and the highest technically acceptable offeror (RCI) . . . both at the Total Evaluated Price level and at the unit price differential/expenses level."  *Id.*  In addition, the Contracting Officer explained that "Hawax's differential/expenses for CLIN 16 is the same as for CLIN 15 ($[. . .]) and higher for CLIN 17 ($[. . .])."  *Id.*  Based on the same rationale upon which the Contracting Officer found Hawax's proposed price for CLIN 15 to be realistic, the Contracting Officer also found Hawax's proposed prices for CLINs 16 and 17 to be realistic.  *Id.*

Notably, the Contracting Officer used the same methodology to compare the offerors' prices and determine that RCI's price for CLIN 14 was realistic.  AR 1294.  Based on a review of the unit and total evaluated prices of all three offerors, the Contracting Officer concluded that the "prices did not appear to be low and the market established the competition."  *Id.*

Turning to RCI's protest, it bears noting that RCI does not contend that price comparison is per se an unacceptable method of conducting a price realism analysis—nor could it.  Under the terms of the Solicitation, DLA did not commit itself to any particular methodology for assessing price realism, only that it would consider price realism "to determine if a low price reflects the

contractor's ability to understand the inherent risk in the requirement." AR 151.  Thus, DLA had discretion to decide the "the nature and extent" of its price realism analysis, and its "assessment of potential risk associated with a proposed price." *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 541 (2013) (cleaned up) (quoting *Afghan Am.*, 90 Fed. Cl. at 357, 358).  As other judges of this court have explained, "an acceptable price realism methodology might include 'comparison of the prices received with each other.'" *Id.* at 542 (quoting *Afghan Am.*, 90 Fed. Cl. at 358).  As such, DLA's decision to compare the prices proposed by all technically acceptable offerors constitutes a valid and reasonable price realism methodology.

Notwithstanding the above, RCI argues that DLA's comparison of "two or three prices against one another was not a rational methodology here" since "it assumed that a price was realistic so long [as] it was relatively 'close' to the next lowest price." ECF No. 24 at 32.  RCI argues that "relative proximity between prices provides no indication that the lowest-submitted price is also not 'too low,'" because it is entirely possible that both Shanica and Hawax submitted prices that reflected a risk of unsuccessful contract performance.  *Id.*  To support this argument, RCI cites to *DigiFlight v. United States*, 165 Fed. Cl. 588 (2023), in which another judge of this Court held that an agency's price realism analysis was irrational because it failed to consider the possibility that both lowest priced offerors had proposed unrealistic prices.  *Id.* at 34.  In *DigiFlight*, three bidders submitted quotations, and in conducting a price realism assessment, the evaluators used a price comparison methodology to find adequate competition between the awardee and the third bidder, both of which submitted low prices.  165 Fed. Cl. at 595.  "[W]hile both companies offered composite rates well below the IGCE composite rates, the [procuring agency] found that multiple companies offering low composite rates suggested there was no evidence of an attempt to offer unrealistically low prices as a strategy to receive the award[.]"  *Id.* at 596.  The court held

that it was irrational for the agency to assume that both offerors could not propose unrealistic prices, as it was "conceivable that two companies—competing for award—would have similar motivations for lowering the price of the quotations, even to the point of offering unrealistically low prices." *Id.* at 600.

RCI's reliance on *DigiFlight* is misplaced. Here, unlike in *DigiFlight*, there was no independent government cost estimate casting doubt on the realism of the offerors' prices or the rationality of the price comparison method. More importantly, there is no dispute in this case that DLA's price comparison included at least one realistic price—RCI's price. The faulty premise identified in *DigiFlight*, that potentially neither price compared was realistic, is simply not present in this protest. RCI's argument thus boils down to a disagreement with the extent of DLA's analysis. However, this is a matter left to the exercise of the Agency's discretion. *Mil-Mar*, 111 Fed. Cl. at 541. The Court will not now second guess the manner by which the Agency chose to conduct its price comparison analysis.

RCI also claims that the instant case is similar to *Active Network, LLC v. United States*, in which the court found a price realism analysis unsatisfactory where it only "mention[ed] the price of each offeror in the competitive range . . . listed and organized from lowest price to highest price" but lacked discussion of whether "any of these prices are realistic in relation to the standards discussed in Section M of the RFP." 130 Fed. Cl. 421, 428 (2017); *see* ECF No. 24 at 35. To be sure, summary conclusions regarding price realism have been held to be insufficient. *See CW Gov't Travel, Inc. v. United States*, 154 Fed. Cl. 721, 740 (Fed. Cl. 2021). But that is not what happened here. Instead, for both the Syria CLINs and the individual Iraq CLINs, the Contracting Officer explained his review and comparison of the offeror prices and articulated the conclusions he drew from his analysis. *See* AR 1293–96. The Court will not substitute its judgment for that

34

of the Agency, and RCI has not pointed to anything in the record or the language of the Solicitation that would persuade the Court that a more in-depth analysis is needed in this case.

RCI next contends that the Contracting Officer's price realism analysis was irrational because it included the comparison of prices derived in part from "large government-mandated plug numbers." ECF No. 24 at 36–39. As previously explained, under Factor 3 Price, the Solicitation instructed offerors to propose a price per gallon for each CLIN using the RFP's Attachment 1, Price Data Sheet. AR 145–46. An offeror's "total offer price" for a CLIN reflected the sum of a government-provided "reference price" per gallon, plus the offeror's differential expenses (*i.e.*, markup). AR 151. The "reference price" represents the market price for fuel tied to an index and intended to approximate "an offeror's anticipated fuel cost." AR 1295; *see* AR 14. The "differential/expenses" category represented costs beyond the fuel itself, such as expenses, transportation, logistics, additives, safety, environmental compliance, and profit. AR 1079–80. For evaluation, the total estimated price would be determined by multiplying the offered unit price per gallon for each individual CLIN by the estimated quantity stated in the Solicitation schedule. AR 151.

RCI contends that the Agency's price realism analysis should not have included the Government's reference price for fuel, but instead should have considered only the "differential/expenses" information proposed by each offeror. ECF No. 24 at 36. Because this differential figure was "the sole pricing variable that offerors could manipulate[,]" RCI argues it was unreasonable to analyze the total price including the government-provided plug numbers because the plug numbers overshadowed the contractor-proposed differentials. *Id.* The Court is unpersuaded.

As an initial matter, what RCI refers to as a "government-mandated plug number" is merely

what the Solicitation defines as the market price for fuel, set by a third-party commercial entity, showing the average market price of fuel in a region.  AR 14.  The Agency would utilize the reference prices to adjust contract prices to meet the Agency's needs, as provided in the economic price adjustment clause of the Solicitation.  *See id.*  As the Source Selection Authority noted in the award decision, "the actual price an offeror pays for fuel from a given refinery may be more or less than the reference price."  AR 1295.  Further, while it is possible that comparing price differentials would be *one* permissible way to assess price realism, the Court again notes that "the nature and extent of a price realism analysis is ultimately within the . . . agency's discretion."  *Afghan Am.*, 90 Fed. Cl. at 358.  DLA's decision to base its price realism analysis on the total evaluated price (*including* the differential) falls squarely within its discretion.  The Solicitation after all sought to award fuel contracts, and as such, evaluating prices that included both fuel and markup is not unreasonable.[12]

For these reasons, the Court finds that DLA conducted a rational price realism analysis.

### E.    The Contracting Officer's Responsibility Determinations for Shanica and Hawax Were Not Arbitrary, Capricious, or an Abuse of Discretion.

RCI lastly contends that DLA erroneously found Shanica and Hawax to be responsible contractors.  RCI broadly challenges DLA's responsibility determinations on two grounds.  First, RCI argues that DLA "misapplied the governing standard regarding responsibility determinations"

---

[12] RCI additionally argues that the Agency's comparison of average prices was a "meaningless metric" and "relied on incorrect computations."  ECF No. 24 at 39–41.  However, the table RCI points to in the award decision supports the Agency's "fair and reasonable" price determination" and shows a "comparison of average prices paid for [historical One-Time Buys ("OTBs")] compared to the average prices offered by the three awardees for each fuel type."  AR 892–93.  RCI claims that the GAO erroneously mixed up the analysis for price reasonableness with price realism and erroneously relied on the DLA table.  ECF No. 24 at 39–41.  Since the question before the Court is whether the *Agency's* price realism analysis is rational, RCI's claims of error in the GAO's advisory decision are irrelevant.

and that the Contracting Officer failed to make an "affirmative" determination of responsibility with respect to Shanica and Hawax.  ECF No. 24 at 51.  Second, RCI argues that the Contracting Officer failed to consider whether Shanica and Hawax are responsible under the relevant FAR regulations.[13]  *Id.* at 51–52.  The Court agrees with the Government that the Contracting Officer applied the correct standard governing responsibility determinations and did, in fact, make an affirmative finding of responsibility.  *See* ECF No. 27 at 54–57.  The record also clearly reflects that the Contracting Officer considered the relevant FAR regulations when making its responsibility determination.  Therefore, RCI fails to show a basis for the Court to overturn the Agency's responsibility determination for either awardee.

Pursuant to FAR 9.103(b), in "the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility."  48 C.F.R. § 9.103(b).  In other words, the FAR contemplates only two types of responsibility determinations: an "affirmative determination of responsibility" and a nonresponsibility determination that is assigned absent clear evidence that the contractor is responsible.  *See id.*  RCI contends that the Contracting Officer did not make an affirmative determination of responsibility, instead stating only that the "similarity among proposals is not a sufficient basis on which to determine Shanica [and Hawax] nonresponsible."  AR 1304; *see* AR 1312.  The record reflects otherwise.

The Contracting Officer drafted two detailed memoranda documenting affirmative

---

[13] RCI also alleges that the Contracting Officer's failure to reasonably investigate RCI's allegations presents an independent ground to determine that the Agency's responsibility determination is contrary to regulation and unsupportable.  ECF No. 24 at 53.  Since the Court has already addressed the reasonableness of the Agency's investigation into RCI's allegations against Shanica and Hawax, *supra* § III.C, the Court also rejects this argument as a ground to overturn the Agency's responsibility determinations.

findings of responsibility for Shanica and Hawax.  The memoranda describe the information the Contracting Officer reviewed to determine responsibility, as well as his investigation of RCI's allegations.  *See* AR 1298–1304, 1306–12.  Based on the information reviewed, the Contracting Officer found that Shanica and Hawax "meet[] all the general standards of FAR 9.104-1" and are "responsible prospective contractor[s]."  AR 1297; *see* AR 1305.  The memoranda then reflect the Contracting Officer's consideration of RCI's allegations of misconduct and confirm that the assertions "do not alter his affirmative determination of responsibility."  AR 1297; *see* AR 1305.  Thus, contrary to RCI's argument, the Contracting Officer did not find Shanica and Hawax responsible because RCI failed to provide a sufficient basis for a nonresponsibility finding.  *See* ECF No. 24 at 51.  The memoranda show that the exact opposite happened.  RCI's argument is thus without merit.

RCI further asserts that the Contracting Officer failed to consider whether Shanica and Hawax are responsible in accordance with FAR-specific requirements including: (1) whether Shanica and Hawax could comply with the required or proposed delivery or performance schedule, (2) whether Shanica and Hawax had access to the necessary technical equipment and facilities to perform, and (3) whether Shanica and Hawax had a satisfactory record of integrity and business ethics.  *Id.* at 51–52.  The FAR mandates that:

> [t]o be deemed responsible, a prospective contractor must: . . . [b]e able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments; . . . [h]ave a satisfactory performance record; . . . [and] [h]ave the necessary production, construction, and technical equipment and facilities, or the ability to obtain them.

48 C.F.R. § 9.104–1(b)–(c), (f).

Contrary to RCI's argument, there is ample evidence in the record to support that DLA addressed delivery and performance factors in assessing Shanica's and Hawax's technical

acceptability, AR 884–85, and found a "reasonable expectation" that Shanica and Hawax would "successfully perform the required effort." AR 1298; *see* AR 1306. Additionally, the Contracting Officer reviewed Shanica's and Hawax's past performance in making affirmative findings of responsibility and reassessed fuel supply and transportation plans during his investigation of RCI's allegations, finding both offerors' technical proposals well documented. AR 1298, 1301–03, 1305, 1308–10. The Contracting Officer also addressed RCI's concerns regarding Shanica's business integrity and rejected its allegations that Shanica engaged in bribery or had any connection to Asayish's instructing RCI not to register to do business in Syria. AR 1299. These memoranda, which document the Contracting Officer's considerations (consistent with the relevant FAR requirements) are more than sufficient, especially since a contracting officer "is not required to explain the basis for his responsibility determination" at all. *Konecranes Nuclear Equip. & Servs., LLC v. United States*, 165 Fed. Cl. 421, 434–35 (2023) (quoting *Impresa*, 238 F.3d at 1334).

For these reasons, RCI has failed to show that Shanica's and Hawax's responsibility determinations lacked a rational basis.

**F.      No Injunctive Relief Is Warranted Because RCI Fails on the Merits.**

A party seeking permanent injunctive relief must show that: (1) it "has succeeded on the merits of the case;" (2) it "will suffer irreparable harm if the court withholds injunctive relief;" (3) "the balance of hardships to the respective parties favors the grant of injunctive relief;" and (4) "it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). Because RCI has not succeeded on the merits of its protest, no injunctive relief is warranted in this case. *See Mitchco Int'l, Inc. v. United States*, 26 F.4th 1373, 1384 n.7 (Fed. Cir. 2022); *ANHAM FZCO v. United States*, 149 Fed. Cl. 427, 439 (2020) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 (Fed. Cir. 2018)).

**IV.  CONCLUSION**

For the reasons set forth above, the Court **DENIES** RCI's Motion for Judgment on the Administrative Record (ECF No. 24) and **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record (ECF No. 27).  The Clerk is directed to enter judgment accordingly.

This opinion and order will be unsealed in its entirety after August 26, 2024, unless the parties submit **by no later than August 22, 2024,** an objection specifically identifying the protected information subject to redaction.  Any objecting party must submit a proposed redacted version of the decision and provide the reason(s) supporting the party's request for redaction.

**SO ORDERED.**

Dated: August 15, 2024                                        */s/ Kathryn C. Davis*
                                                             KATHRYN C. DAVIS
                                                             Judge